## Chew *et al.*, Executors of Chew, *versus* Gillespie.

The holder of a warrant of 425 acres agreed to give Martin half the land " in quantity and quality," if he would make a settlement. They afterwards ran the line of division, Martin receiving 72 acres more on account of the quality. Martin claimed to the line and both recognised it. Martin's heirs afterwards, by deed to another reciting his settlement on 200 acres, the agreement, &c., conveyed " all their estate in the above-described 200 acres." *Held*, that parol evidence was admissible of what took place at the execution of the deed to show that the 72 acres were not sold, and that, by mistake or fraud in the scrivener, the deed was not drawn so as to exclude them, as had been directed.

November 14th 1867. Before THOMPSON, STRONG, READ and AGNEW, JJ. Absent WOODWARD, C. J.

Error to the Court of Common Pleas of *Butler county* : No. 100, to October and November Term 1867.

This was an action of ejectment by Henry B. Chew and others, executors, &c., of Benjamin Chew, deceased, for a piece of land situate in Cranberry township, Butler county. The writ was issued June 23d 1847. The tract in dispute is part of a tract of 425 acres, warranted in the name of John Metzgar, the warrant on the 6th of April 1796 having been held by General John Wilkins. The warrant and patent title were admitted at the trial to be in the plaintiffs, and the land in dispute, 74 acres and 134 perches, to be in possession of the defendant.

The defendant gave in evidence an agreement dated April 6th 1796, between Wilkins and Daniel Martin, by which Martin agreed, on or before the 10th of April then instant, to settle and improve the tract, and continue the settlement for five years, build a house fit for habitation, &c., and in consideration Wilkins covenanted to convey to Martin, " his executors, administrators and assigns, 200 acres of said land, to be divided as fairly as possible, according to quantity and quality, reserving to said Martin all the improvements he may make on said land, and the said quantity of land. The said John Wilkins, &c., shall at the termination of the aforesaid period of five years give a deed for the same, free of all encumbrances, and shall warrant, &c., to the said Daniel Martin," &c.

It was admitted that the defendant held the title to the land in dispute from Martin's heirs. The conveyance from the Martins, under which the defendant claimed, was made to his ancestor, John Gillespie, in June 1842.

The defendant gave evidence by James Anderson that about 1806 witness was present with Rippey, a surveyor, Wilkins and Robinson, agent of Wilkins, and a number of settlers on adjoining lands, to divide the tract between Martin and Wilkins ; that whilst

[Chew v. Gillespie.]

running the line Wilkins said "he had given Martin seventy odd acres more than the half of the tract, on account of him (Wilkins) getting the bottom side the way he wanted it." There was evidence showing the running of the line to which the defendant claimed, the continued occupancy of the land in controversy by Martin and his successors, and its recognition by the holders of the Wilkins' title. There was also evidence that one Stamm, who derived title from Martin, when a survey was made by James Dunlap in 1841, in the presence of Chew's agent, claimed only 200 acres, and the survey was run off so as to leave the 74 acres between Stamm's line and Chew's line.

The plaintiff in rebuttal gave in evidence a deed from Martin's heirs to Daniel Stamm, dated March 19th 1836, reciting that Daniel Martin, as an actual settler, possessed a tract of land of 200 acres, with allowance, part of a larger tract surveyed on a warrant to Metzgar, and by an article of agreement between Martin and Wilkins, the then warrant holder, "Martin was to have 200 acres, to be divided according to quantity and quality, and allowance for completing the settlement, which settlement was completed, but the deed has not been made," reciting also the death of Martin, devising the land to his two sons, Alexander and Daniel, and release of Alexander's share to Daniel, "and the said Daniel became the sole owner of said 200 acres of land,"—his death intestate and his "heirs finding it more to their interest to sell their interest in the said land, have bargained for the purpose with the said Daniel Stamm," and "for and in consideration of $1200, do grant, &c., unto the said Daniel Stamm, his heirs and assigns for ever, all the estate, right, &c., whatsoever of them, their undivided shares in or to the above described 200 acres."

Buhl, the agent of Chew, testified that he was present at the making of the survey by Dunlap in 1841; the Stamms were present, they said they would claim no more than the 200 acres; Buhl wanted them to claim more; that he did not tell them of their right to go to the line of the disputed tract; that he wrote the deed at the instance of the heirs of Martin, and was not instructed to make any reservation in the deed.

The defendant also gave in evidence a deed dated December 17th 1849 (being after the commencement of the suit), to Jacob Stamm from Benjamin's Chew's executors, who, in consideration of one dollar, "and the hereinafter mentioned articles of agreement, and in full satisfaction, &c., of the said articles of agreement, and of all and every right, &c., under or by virtue of, &c., the said articles of agreement, or by all persons whatsoever against the estate of the said Benjamin Chew, deceased, &c., or to or out of any other part or tract of said land," granted, &c., "all that certain lot or parcel of land, being part of a larger tract warranted in the name of John Metzgar," patented to Miller & Murray,

whose title is vested in the estate of said Chew, said lot "being contained, as per survey made by J. Dunlap, at the instance of, in the presence of, and assented to and approved by the late Daniel Stamm, the then owner of the estate, &c., of Daniel Martin, as original settler, and C. Buhl, then agent of B. Chew, within the following bounds," &c., " the said lot, &c., being the same which was laid off by J. Dunlap as aforesaid for the gratuity, and now conveyed and received as such under the articles of agreement dated the 6th day of April 1796," between Wilkins and Martin, &c., whereby Martin became entitled to 200 acres, as mentioned in the articles, and all his "right, &c., by virtue of the articles was conveyed to the late Daniel Stamm, now deceased, by deed of the heirs of" Martin, dated March 19th 1836, and since the death of Daniel Stamm his title has become vested in Jacob Stamm.

The plaintiff having rested, the defendant called David Mc-Donald, who testified that he went to the house of Buhl, at the request of one of the Martins and John Gillespie, for the purpose of making a deed to Stamm ; Buhl was agent for Chew, and the heirs of Martin then requested witness to act for them ; it was March 19th 1836 the day the deed was drawn.

The defendant then offered to prove by witness :—

1. What quantity of land Stamm had purchased, for which a deed was to have been made.

2. To show clear mistake on part of the scrivener in omitting to express or make the exception.

3. To show, with other proof to follow, that Buhl, being then the agent of Chew, fraudulently omitted what both the vendors and vendees had told him to insert.

4. To explain the latent ambiguities on the face of the deed.

5. To contradict Buhl, who swears he was not asked to make any exception.

6. To rebut any presumption which the plaintiff may allege arises from the conduct of Stamm, after the deed was executed, prejudicial to the interest of either Stamm or Martin to the residue of their land.

7. To be followed by exhibiting in evidence a release of Daniel Stamm to John Gillespie for the residue, made before the deed from Chew's executors to Stamm.

The plaintiff objected to the offer.

Before the court determined upon the evidence the defendants offered the following deed :—

" Know all men by these presents, that I, Jacob Stamm, of Cranberry township, Butler county, Pennsylvania, in considera-tion of the sum of one dollar, to me in hand paid by John Gil-lespie, do hereby release and for ever quit claim unto the said John Gillespie, his heirs and assigns, all my right, title, interest

[Chew *v.* Gillespie.]

and claim of, in and to seventy acres of land, more or less, situate in the township, county and state aforesaid; bounded on the south by lands of McGregor's heirs, on the east by the two hundred and twelve acres purchased by my father, Daniel Stamm, from the heirs of Daniel Martin, Jr., on the north by lands of Jacob Stamm and Chew's heirs. To have and to hold the above-described seventy acres of land, more or less, unto the said John Gillespie, his heirs and assigns for ever; reserving to myself alone two hundred and twelve acres which was purchased as aforesaid by my father from Daniel Martin, Jr.'s, heirs.

"In witness whereof I have hereunto set my hand and seal, this 19th day of November, A. D. 1846."

The offer was objected to by the plaintiff; the court received the evidence, and sealed a bill of exception.

The court also admitted the prior offer, saying:—

"We receive the evidence for the purpose of showing what the parties understood was the amount of land they were conveying and the vendee receiving, when taken in connection with the proof in the case as to what Stamm said when it was surveyed, and in connection with his act, release or disclaimer in delivering the deed or contract of release in evidence, 19th November 1849, for the purpose of repelling the presumption which the plaintiff may raise, based upon the survey made by Chew, and the reception of the deed by them from Chew's executors, in evidence on the part of the plaintiff, that he, Stamm, had received said deed in full of all claim, title or estate, he, as alienee of Martin's heirs, had in the land in dispute, and to show a mistake in the scrivener, if any, in drawing up the deed from Martin's heirs to Stamm."

At the request of the plaintiff the court sealed a bill of exceptions.

The witness testified: "By direction of the heirs, I told Judge Buhl that they had sold to Daniel Stamm 200 acres with the allowance on the west side of the tract, and that they wanted him to put nothing in that deed that would mar their claim to the 72 acres which they had claimed in addition to what they had sold to Stamm. His reply was, he should be very sorry to do so. Our understanding was as to quantity and quality. Buhl said he could make an entry of that; but the way he did it made a different meaning of it. The Chews were to give them all the bottom. The land had been divided before; Stamm was present, and made no objection. He was there all the time. He, Buhl, knew about the 70 acres; and Stamm knew of the 70 acres. He said nothing about the 70 acres. He counted the money down, $1200 in silver; that was for the 200 acres. I saw the money, counted the money, and that was the understanding. I told Buhl at the time of this residue of 70 acres. We told him the part was to

[Chew *v.* Gillespie.]

be on the west. I did not, when the deed was made, nor any one else when it was read, object to its phraseology or language as different, or conveying a different meaning, or anything we did not mean. Buhl was the agent of Chews at the time; and as the agent of Chews he made the survey; but he was not their agent in drawing this deed. There was nothing said as to where Stamm's line would cut with reference to the house. All the heirs were there.

"Deed was read over to them at the time; nothing was said after it was read. Old Daniel, the grandfather, was present also. Nothing said where they would commence to run the line. The heirs told me the way they discovered there was 70 acres was by Purviance's survey. There was no dispute about the land nor line that day. I advised them to return the surplus and have it taxed. Judge Buhl said it was not necessary."

The plaintiff submitted the following points, amongst others:—

"3. The deed from Martin's heirs to Stamm passed their entire interest in the land, under the contract which it acknowledges, and cannot be diminished by parol proof that seventy-two acres was reserved at the time of execution by Martin's heirs.

"4. Stamm being the owner or assignee of the Martin contract, Chew and he had the power to adopt new lines, which bound them, unless fraud or mistake shown.

"6. The deed of Martin's heirs to Stamm, and the survey, and deed in pursuance of the survey, by Chew's executors to Stamm, estops the Martin's heirs from setting up their title as against Chew."

The court (McGuffin, P. J.) answered:—

"3. The deed from Martin's heirs to Stamm, undescriptive as it seems to be, might be sufficient to pass all their interest in the land in dispute; yet, parol evidence may be received to ascertain the correct amount of land intended to be conveyed, provided the jury are satisfied from the weight of evidence that the scrivener made a mistake in drawing the same, and within its description included the land in dispute; and, having ascertained the land in dispute was excluded by the parties to the contract, they may treat the deed as passing no title thereto.

"4. We answer this in the affirmative, if the facts in evidence show to the jury's satisfaction that the entire land claimed by Martin's heirs was sold to Stamm. Yet if, from all the evidence in the cause, the jury are satisfied that the land in dispute was not sold to Stamm, he could not change the original division line between him and Chews, or thereby to disturb the claim of the defendants further than to enable Chew to lay off the two hundred acres and allowance from the west end, and take a conveyance for the same, leaving the residue to be enjoyed as claimed by the

Martin heirs under the title which they may be able to show in the same.

" 6. We answer this in the negative."

The verdict was for the defendant, and the plaintiffs took a writ of error.

They assigned for error the admission of the evidence of Mc-Donald and the deed from Stamm's heirs to Martin; and the answers to their points.

*J. Bredin*, for plaintiffs in error, cited Collam v. Hocker, 1 Rawle 108; Beeson v. Hutchinson, 4 Watts 442; Kennedy v. Plank Road, 1 Casey 226; Clark v. Dougan, 2 Jones 92; Royer v. Benlow, 10 S. & R. 303.

*J. M. Thompson* and *S. A. Purviance*, for defendant in error, cited Bank v. Fordyce, 9 Barr 279; Rearich v. Swinehart, 1 Jones 238; Barnhart v. Riddle, 5 Casey 96; Scheliger v. Kopple, 3 Grant 54; Aldridge v. Eshleman, 10 Wright 426; Musselman v. Stoner, 7 Casey 270; Lauchner v. Rex, 8 Harris 464; Chalfant v. Williams, 11 Casey 212; Miller v. Smith, 9 Id. 395.

The opinion of the court was delivered, January 7th 1868, by

READ, J.—John Wilkins, Jr., being the owner of the Metzgar warrant, on the 6th April 1796 entered into an agreement with Daniel Martin, by which Daniel agreed, on or before the 10th April instant, to settle and improve the tract covered by the warrant on Big Connoquenessing creek, and continue said settlement for five years, build a house fit for the habitation of man, &c. Wilkins, in consideration, covenanted to convey to said Martin 200 acres of said land to be divided as fairly as possible, according to quality, reserving, nevertheless, to the said Martin all the improvements he makes on said lands, and, at the determination of the aforesaid period of five years, give a deed for the same free from all encumbrances. Martin fulfilled his agreement, and in 1806 James Robinson, as agent of John Wilkins, brought Samuel Rippey as surveyor, and run off Daniel Martin's share, in the presence of a number of the settlers on adjoining lands. The line thus run gave Martin 70 odd acres, more than the half in quantity, which Wilkins agreed to, because he got the rich bottom-land which he wanted, which made his half equal " according to quality." The evidence leaves no doubt that this division was made in conformity to the original agreement, and each party became the separate owner of the part thus set off to him.

This agreement and division were ratified and confirmed by the 1st section of the Act of 20th March 1811, 5 Sm. Laws 207, and the title vested in the said Wilkins and Martin according to the

agreement. When, therefore, Benjamin Chew succeeded to the title of Wilkins, it gave him no title to Martin's land, to whom, when called upon, he was bound to convey the dry legal title vested in him by the patent from the Commonwealth.

On the 19th March 1836, the children and heirs of Daniel Martin by deed conveyed to Daniel Stamm 200 acres. The language of the deed, unexplained, appeared to be a conveyance of the whole of Martin's share, although it was certain Stamm got his 200 acres, leaving the Martins in possession of 72 acres, within the line run off and settled in 1806, and after the commencement of this suit, Stamm's representatives released and conveyed the same to Martin's heirs. Between them there was no mistake, for both recognised the fact that the 72 acres were never conveyed, nor intended to be conveyed, by the deed of the 19th March 1836.

On the trial, the plaintiff produced this deed to show that the whole of Martin's title and land had been conveyed to Stamm, and to introduce another deed from the executors of Benjamin Chew to Stamm, executed twenty-eight days after Stamm's release to Martin's heirs.

The question, therefore, became a material one, Were the 72 acres included in the deed from Martin's heirs to Stamm? and parol evidence was offered to prove what took place at the execution of it, showing the real intention of the parties, and that by a clear mistake of the scrivener at the very least, he entirely omitted so to describe the premises as to leave the 72 acres unconveyed and the property of Martin's heirs, which mistake was afterwards corrected by Stamm's representatives. The court properly admitted the evidence, which was clear and distinct.

In Chalfant *v.* Williams, 11 Casey 215, the late Chief Justice said: " If we had held to the rule that is laid down in Starkie's Evidence, part 4, p. 1009, that parol evidence is inadmissible for the purpose of altering the legal operation of an instrument, we should be obliged to reverse the ruling in this case. But we have got far away from that rule. We permit a deed absolute on its face to be proved a mortgage ; we receive parol evidence to rebut a presumption or an equity—to supply deficiencies in the written agreement—to explain ambiguities in the subject-matter of writings—to prevent frauds and correct mistakes."

The court were right in admitting the evidence, and in their answer to the plaintiffs' points.

Judgment affirmed.